Ruffin, C. J.
 

 The Court is of opinion, that the plaintiffs are entitled to the relief they ask. It is clear, that, at the time Spruill let Amis have the money and took the bond, he had in his hands a larger sum belonging to the ward, which it was his duty to put out at interest. When he lent-the money and took a bond payable to him, as guardian, it was an appropriation of this debt to 'the ward; at all events, as against Spruill himself. It is true, the bond does not appear in the guardian account of February 1839; but that can make no difference, if it really belonged to the ward, because in that case it was the duty of the guardian to return it, as an investment for the ward. The omission of the duty cannot injure the
 
 *284
 
 ward. We think it cannot be doubted, if Spruill had died and left this bond payable to him as guardian, and he had been found to have been indebted to the ward at the time he took the bonds, at the time of his death and at every intermediate period, in a larger amount than that of the bond, that a Court of Equity would have compelled his executor to deliver it to the infant, as his property, in preference to applying it to the guardian’s general creditors. Taking it payable to him, as guardian, could,
 
 prima facie,
 
 have no other object than to designate it as a portion of the ward’s
 
 estate
 
 and set
 
 it
 
 apart accordingly. His subsequent declaration, that he had funds, amply sufficient to pay the ward, has no effect against the ward’s right. He did not mean, that he had never-considered the bond as belonging to the ward. But we collect rather the reverse, from his reference to the form ©f the instrument. All he meant was, that notwithstanng" he had made the bond the ward’s, by the manner in which it was taken, and hence he might be supposed to have acted wrong in parting from it, as he had, and for the purposes he had, yet it would not really be to the prejudice of the ward, as he had other funds with which he could pay the ward. He was, in truth, apologising in a lame-way for what appeared to be a breach of duty, and at the same time endeavoring to keep up his own credit, by holding out that the ward could not be hurt, because he had made the debt his own, and was able to pay it. If thát had turned out to be true, all would have been wrell: for it is only when a trustee, who violates his' trust, becomes insolvent, that a contest arises, by the necessity of ther
 
 ceslui qué trust
 
 following his property into the hands, i» which it was wrongfully put by the trustee, or submitting to the loss altogether. In this case it turned out to the-contrary of Spruill’s expectations, or, at least his declaration, and he proved unable to make the debt good. Would he therefore have the right to. withold the bond -from the ward ? Certainly not. If he still had it,, he-
 
 *285
 
 would be decree^ to deliver it to the ward. Then,
 
 prima facie,
 
 Bowden, who claims under it, cannot withold it. But he insists that he ought to be protected, for two reasons. The one is, that he had no knowledge nor just reasons to believe, at the time he took the bond, that it belonged to the ward; and the other, that, if the ward was the owner, yet a guardian has lawful authority to collect or dispose of debts to the ward, and that he is a purchaser for money paid, and securities surrendered.
 

 Upon the first point the Court holds, clearly, that Bowden is affected with notice. The bond, upon its face, disclosed the interest of the ward; told that he was the equitable owner, just as much as its being payable to the ward would have shown him to be the legal owner. But the defendant says, that, notwithstanding that circumstance, he did not in fact know it. The reason he gives, why the bond did not convey that information to him, is, not that the bond does not naturally import it, but that he had understood that some guardians had taken bonds payable to them, as guardians, for money that was their own, and that he had heard from Spruill that he had pursued such a practice. But that is a most illogical conclusion, and, if tolerated, would lead to serious mischief. It is an attempt to deny notice, which the instrument in its plain sense conveys, because it might be false. Although some persons might have corruptly endeavored to evade the statute of usury, and get compound interest by resorting to the device supposed, yet it did not follow, that this bond was not what it purported to be. It stated, that it was the equitable property of the ward, and, in dealing for it, he had to choose between the fact thus stated in it, and the opposite possibility or probability arising out of what he had heard some people had deceitfully practised. That was his risk; and it has happened that he reasoned falsely and came to a false conclusion, as it appears that the bond really belonged to the ward, as it purported on its face. In
 
 Fox v. Alexander,
 
 1 Ired. Eq. 340, it was considered
 
 *286
 
 decisive, that the bond was payable “ to R. D., guardian of R. R. D.” Indeed, it was not a case, upon which the party was put upon enquiry merely; but in itself the bond contained full notice, and the only question was, whether it spoke the truth or falsehood. The most precise and circumstantial information would not amount to notice, if it could be got rid of by a person’s declaration, that he did not believe it, because he had heard in other cases of such having been done colorably.
 

 Upon the other point, it need not be denied, that a guardian has power to discount or otherwise dispose- of a bond belonging to the ward, as well as to collect it. It is not so obviously necessarjq that he should have that power, as that an executor should. The necessities of a testator’s estate may often require the executor to raise money upon the securities belonging to the estate. But infants commonly corrió to their property as the surplus of settled estates, and can hardly be properly in arrear to the guardian. Therefore it is, at all events, more suspicious in a guardian than in an executor, to be found disposing of the securities; and one to whom they were offered, would naturally enquire for, at least, some apparently good reason for his doing so. But for the purposes of the case in hand, it may be admitted, that the two, a guardian and an executor, stand on the same footing. For it is well settled, that if the person who takes a security from an executor, knows that the executor is raising money on it for purposes not connected with the affairs of the estate, and especially when the executor uses the testator’s effects to pay his own antecedent debt to that person himself, it is deemed an act of concerted fraud between the two, and the owners of the property have a right to reclaim it. For this position, we need go no farther back than the cases of
 
 Scott
 
 v.
 
 Tyler,
 
 2 Dick. 712 and
 
 2
 
 Bro. C. C. 431, and
 
 McLeod
 
 v.
 
 Drummond,
 
 17 Ves. 153, in the latter of which, Lord Eldon collects all the learning upon the point, and kiys down
 
 *287
 
 the rale distinctly. In conformity -with, tb.e same principles, the cases were decided here of
 
 Bunting
 
 v.
 
 Ricks, 2
 
 Dev. & Bat. Eq. 130.
 
 Fox
 
 v.
 
 Alexander,
 
 and
 
 Powell
 
 v.
 
 Jones,
 
 1 Ired. Eq. 337. And we then held, that the assignee of the bond was liable to the full amount of it, though he paid for it partly in cash, because it was originally the equitable property of the ward, or other
 
 cestui que trust,
 
 and had not been transferred
 
 bona fide,
 
 and therefore remained his property. Supposing the law to be the same as to executors and guardians, then, if in this case Bowden had done nothing more than advance the $700 or $800 to Spruill, he might insist cn holding the
 
 bond
 
 as a security for it, although Spruill afterwards converted the money to his own use ; for Bowden might say, he thought he was advancing it for the benefit of the ward. But he cannot say that now. The application, at the time, of $1,200 of it, to the guardian’s own debt to Bowden, and the gross oppression to which the guardian submitted, in order to get hold of the residue of the price in cash, clearly proved, that both Spruill’s integrity and his prudence gave way under
 
 his
 
 necessities, and ought to have led Bowden to expect, that Spruill would apply, as he did apply, the whole to his own use. It is in that point of view only, that the hard terms imposed on Spruill can be looked at in this case. The ward has no right to complain of the oppression on his guardian. But the guardian’s agreeing to such terms, being 10 per cent, on the whole bond of nearly $1,900 in order to get about $700 in ready money, he remaining liable on his endorsement, as he had been for his old debt, was,enough to assure Bowden, that Spruill was not raising the money for his ward. No guardian ever raised money for a ward at a loss of 25 per cent, or upwards. The truth is that the transaction throughout was a breach of trust in Spruill, and in the view of a Court of Equity, a fraud on the ward; and Bowden must have seen it, unless he was wilfully blind, and therefore he must be regarded, as concurring
 
 *288
 
 in it, and thereby to have lost the character of a
 
 bona fide
 
 purchaser to any purpose, and be accountable for the whole bond to the ward, and, by consequence, to the present plaintiffs, who have paid the ward and are entitled to stand in his placo.
 

 Per Curiam.
 

 Decree for the plaintiffs.